IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

ADVANCED FIBER TECHNOLOGIES
(AFT) TRUST,

          Plaintiff,

     -against-

J&L FIBER SERVICES, INC.,

         Defendant.

Civil Action No:  07-01191 LEK/DRH

---

## DEFENDANT'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 7.1(a)3, below are the material facts in support of this Motion for Summary Judgment about which the Defendant, J&L Fiber Services, Inc., contends there exists no genuine issue, with specific citations to the record where such facts are established:

*The Action*

1.      On November 9, 2007, Advanced Fiber Technologies ("AFT") Trust commenced the instant action against Defendant, J&L Fiber Services, Inc. ("Defendant" or "J&L"), for infringement of certain claims of U.S. Patent RE 39,940 ("the '940 Patent" or "the Reissue") under 35 U.S.C. § 271.  (Docket No. 1, Complaint ("Complaint"), ¶¶ 15-22.)

2.      On February 22, 2008, J&L filed an Answer and Counterclaim for a declaratory judgment of invalidity, non-infringement, and unenforceability of the '940 Patent.  (Docket No. 12, Answer and Counterclaim of Defendant J&L Fiber Services, Inc. ("Answer and Counterclaim"), ¶¶ 27-36.)

3.      J&L maintains that it does not directly, indirectly, contributorily, and/or by inducement, infringe any valid claim of the Reissue, either literally or under the doctrine of equivalents.  (Answer and Counterclaim, ¶ 23.)

4.      J&L maintains that the Reissue is invalid and/or unenforceable because it fails to meet the conditions of patentability specified in Title 35 of the United States Code, including, but not limited to Sections 101, 102, 103, or 112.  (Answer and Counterclaim, ¶ 24.)

5.      J&L maintains that the Reissue is invalid and/or unenforceable in whole or in part because of failure to comply with the requirements of 35 U.S.C. § 251.  (Answer and Counterclaim, ¶ 25.)

*The Parties*

6.      J&L is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business at 809 Philip Drive, Waukesha, Wisconsin 53186. (Answer and Counterclaims, ¶¶ 2, 29.)

7.      AFT is a Trust organized and existing under the laws of Canada, with a principal place of business at 72 Queen Street, Sherbrooke, Quebec, Canada, J1M 2C3, and with a technology office at 5890 Monkland Avenue, Suit 400, Montreal, Quebec, Canada H4A 1G2. (Docket No. 33, Ex. 2, Declaration of Robert Gooding in Support of Plaintiff's Motion for Summary Judgment of Infringement ("Gooding Decl."), ¶ 6.)

8.      AFT, through its wholly owned subsidiary, Advanced Fiber Technologies, Inc., manufactures and sells screen cylinders under the name "Durashell$^{TM}$."  (Gooding Decl., ¶¶ 12-13.)

9.      J&L is owned by Precision Castparts Corp. ("PCC"), and J&L has been making, using, selling, offering for sale, importing and/or exporting screen cylinders under the designation "V-Max" within the United States.  (Gooding Decl. ¶ 14.)

*The '940 Patent and Screen Technology*

10.     AFT owns the '940 Patent, issued on September 18, 2007, which is the subject of this case.  The '940 Patent is a reissue of U.S. Patent No. 5,200,072 ("the '072 Patent").  The '072 Patent was issued on April 6, 1993 based upon a patent application filed on August 16, 1990.  (Gooding Decl., ¶ 7.)

11.     The '940 Patent "relates to screen plates, e.g., screen cylinders and flat screen plates, for use, for example, in the pulp and paper industry for screening pulps and to methods for their manufacture."  (Declaration of David Cross ("Cross Decl."), Ex. A, '940 Patent, col. 1, lns. 12-15.)

12.     During the prosecution of the '072 Patent, in response to a rejection based on a prior art reference, AFT differentiated a cited prior art reference as failing to disclose "the method by which their filter is manufactured" and as "totally deficient in describing" the type of manufacturing method disclosed in the claims.  AFT further characterized the reference as disclosing "no manufacturing steps . . . whatsoever . . . other than the general concept of <u>cutting the grooves</u>."  (Cross Decl., Ex. B at 8-9.)

13.     Claims including "shrink fit" language were rejected by the Examiner during the prosecution of both the '072 Patent and the '940 Patent for failing to be in compliance with 35 U.S.C. § 112.  (Cross Decl., Ex. C at 2; Cross Decl., Ex. D at 8.)  The original claims of the '072 Patent included two dependent claims, claims 5 and 16, which required "connecting means includ[ing] a shrink-fit one of said screening medium and said backing plate within the other of

said screening medium and backing plate." (Cross Decl., Ex. E at 35, 38.) In response to this rejection, the prosecuting attorney cancelled both claims. (Cross Decl., Ex. B at 1.) When the reissue patent application, which became the '940 Patent, was filed in 2003, more than ten years after this initial rejection, AFT filed a similar dependent claim as claim 25. (Cross Decl., Ex. F at 7.) Here, rather than using the term "shrink fit," the claim read "wherein said connecting means includes shrink-fitting one of said screening medium and said backing plate to the other." (Cross Decl., Ex. F at 7.) This claim was rejected by the Examiner, for the same reason, that is, for failing to be in compliance with 35 U.S.C. § 112. (Cross Decl., Ex. D at 8.) In response, AFT amended "shrink fitting to "shrink fit," the original language rejected in 1991. (Cross Decl., Ex. G at 7.)

14.    Industrial screening is not limited to the pulp and paper industry. Screens are used for a wide variety of applications including, for example, mineral processing, petrochemical processing, food processing, and water supply and treatment. Screens used in the pulp and paper industry can be used in other industries including, for example, the mining industry. Similarly, screens in other industries can be used in the pulp and paper industry. (Docket No. 39, Ex. 8, Declaration of Mark Lutz in Opposition to Plaintiff's Motion for Partial Summary Judgment on the Issue of Infringement ("Lutz Decl."), ¶ 3.)

15.    There are numerous screening operations performed in the process of converting pulp stock into paper. For example, the screening process can be used for segregate constituent parts of a pulp slurry, thickening of pulp stock, dewatering, and cleaning. Many of the screening operations can be performed using the same or similar screening elements with some variations in design, such as selecting the size of the slot width of the screening element according to the screening operation being performed. (Lutz Decl., ¶ 2.)

*The V-MAX*

16.     The accused product in this case is J&L's V-MAX screen cylinder (the

"V-MAX").  The V-MAX includes a screening element and a frame.  The screening element is

constructed using two arc-shaped screen panels, an example of one such screen panel is shown

below.  (Lutz Decl., ¶¶ 7-8.)



17.     The arc-shaped sections that form the screen panels in the V-MAX are assembled

from individual long, thin metal bars, which are called "wires" that include holes that are spaced

apart length-wise.  These wires are "roll formed" (meaning that they are made by passing a strip

of metal through a series of rolls until they achieve the desired shape).  A single wire is shown

below.  (Lutz Decl., ¶ 9.)



18.    The wires are assembled into elongated clips that are generally U-shaped in cross-section and therefore known as "U-clips." These U-clips include parallel slots that are sized to receive the wires. The spacing of these slots determines the wires per inch in the final screen product and, ultimately, the specific spacing of the wires determines the slot width dimension of the screen panels. (Lutz Decl., ¶ 10.)



19.    The wires are secured to the U-clips by elongated pins (shown below) that fit through openings in the wires, and are captured within the U-shaped channel of the U-clip. (Lutz Decl., ¶ 11.)



20.    The wires are aligned in parallel and positioned in the slots of the U-clips, as shown below. (Lutz Decl., ¶ 12.)



21.     The wires are secured to each U-clip by inserting an elongated pin through the holes in the wires and the channel in the U-clip.  (Lutz Decl., ¶ 13.)

22.     The screen panels are assembled using numerous wires and several U-clips, which are spaced approximately two inches apart.  The assembled wires and U-clips result in closely-spaced slotted panels, as shown below, which are subsequently rolled into arc-shaped sections.  (Lutz Decl., ¶ 14.)



23.     A filler epoxy is applied to the U-clips to fill the back of the channels around the elongated pins.  (Lutz Decl., ¶ 15.)

24.     Because the wires are spaced apart from the beginning of the assembly process, there are elongated slots between the wires throughout the entire process J&L uses to manufacture the V-MAX screen panels.  There is never a point in the construction of the screen panel where a closed portion or opening is "exposed."  (Lutz Decl., ¶ 16.)

25.     The screen panels are not constructed from metal plates, and the manufacturing process does not include creating grooves, openings, or perforations in a plate that is punctured, pierced, or machined.  In addition, J&L does not harden the screen panels.  (Lutz Decl., ¶ 17.)

26.     The frame of the V-MAX is a centrifugally cast metal cylinder, which is directly cast in cylindrical form using a mold or form.  The cast, unitary cylindrical frame has a homogeneous wall structure that is substantially uniform in strength.  This is largely due to the

centrifugal casting method, which spins the molten metal as it is being cast.  This method results in a unique grain structure that is aligned in the radial direction about the circumference of the casting.  Also, due to the casting process, the resulting frame does not have the residual stresses of the sort that result from forming a flat plate into a cylinder through cold forming or rolling procedures.  Additionally, the absence of a seam joining the ends of a rolled plate, as in backing plates, renders the cast construction significantly stronger, and better able to handle high-pressure industrial screening applications.  The frame of the V-MAX is not produced from a metal plate, is never flat, and is not a rolled construction.  Rather, the V-MAX frame is cast directly as a cylinder.  Triangular-like openings are cut into the cylindrical frame of the V-MAX. (Lutz Decl., ¶¶ 18-20.)

27.     Grooves are machined on the inside surface of the frame of the V-MAX and are sized to receive a flange extending from the top of each U-clip (shown below) in the screen panels.  (Lutz Decl., ¶ 21.)

Flange



28.     After the frame is completed, the arc-shaped screen panels are tightly banded to compress the radius of the panel and then lowered into the frame, as show below.  After each banded screen panel is inserted down into the frame, the band is cut and the screen panel is clipped into the frame.  (Lutz Decl., ¶ 22.)



29.    The screen panels are clipped to the frame by inserting the flanges extending from the U-clips in the screen panels into the grooves in the frame, and thereby creating an interlocking joint, commercially called the "PosiLock Joint," as shown below.  (Lutz Decl., ¶ 23.)





30.    The interlocking clip and groove features in the V-MAX are the only components that releasably connect the screen panels to the frame.  No additional connecting element is used.

The frame is neither welded nor soldered to the screen panels, and the interlocking clips do not have to be broken to release the screen panels.  No rivets or screws are used to connect the screen panels to the frame.  (Lutz Decl., ¶ 24.)

31.     Seam bars are used to fill in the vertical spaces between the two arc-shaped screen panels.  The seam bars are not tapered and have an essentially constant width (circumferential) dimension.  Starting in approximately 2004, the seam bars were welded to the screen panels to unite the screen panels.  Prior to 2004, the seam bars were not welded to the screen panels.  If there are gaps along the long sides of the seam bars, epoxy resin is used to fill in these gaps between the seam bars and the screen panels.  The epoxy is applied along the length of the seam bars at the inner diameter of the screen panels and bonds to the seam bars and the adjacent wires of the screen panels.  It does not form a bond between the screen panels (or the seam bar) and the frame.  Shrink fitting is neither required nor used with the V-MAX.  (Lutz Decl., ¶ 25.)

32.     The back of each seam bar has numerous cut outs that allow the seam bars to be interlocked with the grooves in the frame as shown below.  The seam bars are neither welded to the frame, nor adhered to the frame with epoxy.  (Lutz Decl., ¶ 26.)



*The Johnson Industrial Screens Brochure*

33.     Johnson Industrial Screens published promotional literature in 1989 (the "Brochure").  This promotional literature lists a variety of applications for screens, including the pulp and paper industry.  (Lutz Decl., ¶ 5; Cross Decl., Ex. H.)

34.     The screen constructions shown and described on page 8 could be used in the pulp and paper industry to screen pulp slurry in preparation for paper making.  (Lutz Decl., ¶ 6.)

35.     The Johnson Screens Brochure discloses a screen assembly comprised of both a screening element and a backing plate, which is illustrated below with reference numbers added. The screen assembly includes a screening medium (12) and a backing plate (14).  The screening medium (12) includes openings or grooves (16), and the backing plate (14) includes openings (28).  Axially spaced projections (24) are provided between the screening medium (12) and backing plate (14), defining recesses (22) between the components.  (Cross Decl., Ex. H at 8.)



36.     The Johnson Screens Brochure states in the caption to the above illustration that the center pipe shown is intended to "increase collapse strength" indicating that the center pipe and screening element are intended to be connected together.  (Cross Decl., Ex. H at 8.)

37.     The Brochure (Cross Decl., Ex. H) specifically states that the screens described in the Brochure can be used for "pulp and paper . . . processing" (Cross Decl., Ex. H at 3), and more specifically for "pulp and paper fiber removal" (Cross Decl., Ex. H at 12).  In deposition testimony, moreover, Johnson Screens' global director of sales (Cross Decl., Ex. I at 7, lns. 23-25), an employee of the company for over 38 years (Cross Decl., Ex. I at 7, lns. 4-5), testified that Johnson Screens sold screens to the pulp and paper industry throughout his entire career in sales (Cross Decl., Ex. I at 20, lns. 19-24), since at least as early as 1976 (Cross Decl., Ex. I at 9, lns. 10-14).  These devices were so well known in the pulp and paper screening industry, in fact, that employees of AFT and their predecessor, CAE, subscribed to Johnson Screens publications and requested copies of their catalogs.  (Cross Decl., Ex. J at 93, ln. 24 - 94, ln. 8; 118, ln. 7-119, ln. 11.)  The Brochure was produced in this case by AFT among a collection of literature kept by its employees.  (Cross Decl., Ex. J at 130-35.)

38.     Deposition testimony from non-party witnesses proves that the Brochure was printed in August of 1989 (Cross Decl., Ex. K at 11, ln. 24 - 12, ln. 1), and distributed to customers soon thereafter.  The routine practice and procedure of the advertising company that prepared the brochure was to print brochures directly after the last changes were made, and then to date the document.  (Cross Decl., Ex. K at 21, lns. 20-25.)

39.     According to the routine practice of Johnson Screens, the Brochure was distributed to the sales force almost immediately after printing.  (Cross Decl., Ex. I at 18, lns. 3-19.)  The Brochure was distributed both to employees and non-employee sales representatives.  (Cross Decl., Ex. I at 18, ln. 17 - 19, ln. 3.)  The sales force also distributed the Brochure to end user customers.  (Cross Decl., Ex. I at 19, lns. 6-7.)

*AFT's Accusations of Infringement*

40.     J&L first became aware of AFT's accusations of infringement of the '072 Patent in February of 2000 in correspondence from AFT's predecessor in interest, CAE, to Mr. Dennis Konkol, then President and General Manager of J&L Fiber Services.  (Declaration of Paul Wasikowski ("Wasikowski Decl."), Ex. A.)

41.     J&L responded on February 23, 2000 stating that it would investigate the matter. (Wasikowski Decl., Ex. B.)

42.     On December 20, 2001, Mr. Konkol, wrote to CAE stating that, after a thorough investigation, J&L had concluded that the '072 patent was invalid, and that J&L's screen cylinders did not infringe the patent.  Mr. Konkol requested a detailed explanation and claim chart within 10 days and stated that, barring receipt of such a chart, J&L would consider the matter closed.  (Wasikowski Decl., Ex. C.)

43.     On January 16, 2003, Mr. Konkol wrote to Dr. Robert Gooding, then Vice President of Technology at AFT, stating that J&L had received a letter from AFT's Canadian counsel, accusing J&L of infringement of Canadian Patent Application 2049279, the Canadian patent that corresponds to the '072 Patent on December 23, 2002, and expressing his surprise at this communication, since J&L had assumed that the matter was closed in December of 2001. (Wasikowski Decl., Ex. D.)

44.     In email correspondence dated January 17, 2003, Dr. Gooding voiced his disagreement with J&L's previous position that prior art and nearly identical products made by other manufacturers rendered the '072 patent invalid.  (Wasikowski Decl., Ex. E.)

45.     In a response dated January 28, 2003, J&L directly alerted AFT of the Johnson Screens Brochure (Cross Decl., Ex. H), including a copy of pages of the Johnson Screens

Brochure, and directing attention to the pictures along the bottom of page 8 of the Brochure. The correspondence also stated that J&L had worked with Johnsons Screens to confirm that similar screening products were produced in the past in the pulp and paper industry, and that prior commercial use of such filtering and screening elements invalidated the patents. J&L also alerted AFT to prior art patents including those naming the inventor of the '072 Patent, and assigned to AFT's successors in interest that were not disclosed to the patent office during prosecution of the '072 Patent. (Wasikowski Decl., Ex. F.)

46.     Dr. Gooding responded on February 17, 2003. In this response, he failed to differentiate the Johnsons Screens Brochure from any of the independent claims of the '072 patent. Instead, Dr. Gooding asserted that "a key point in our patent, however, is 'means for releasably connecting said screening medium with said backing plate,'" and indicated that these means are "an essential feature of the V-max design." (Wasikowski Decl., Ex. G.)

47.     Mr. Konkol responded by noting that means for releasably connecting a screen with a support were known, citing a prior art reference, U.S. Patent number 4,066,555 to Pascale. (Cross Decl., Ex. L.) Mr. Konkol went on to note that, more importantly, "we do not use the means described in your patent (bolts, rivets, welding, or adhesives) to secure our filter screen material in place." (Wasikowski Decl., Ex. H.)

48.     In an email dated January 7, 2004 addressed to Mr. Meixelsperger, Mr. Konkol's replacement, Dr. Gooding told J&L that AFT's position is that while support frames are hardly new, its application to screen cylinders as described in AFT's patent is novel. (Wasikowski Decl., Ex. I.)

*AFT Files a Reissue Application*

49.     On September 12, 2003 AFT filed a reissue application for the '072 patent.  The reissue application included a preliminary amendment which added claims 25-37.  (Cross Decl., Ex. F.)

50.     The application included a declaration under 37 CFR 1.131 establishing an earlier date of invention, as early as January 16, 1990.  (Cross Decl., Ex. M.)  The first named inventor testified that January of 1990 was the earliest date of invention that he could swear to under oath (Cross Decl., Ex. N at 74, lns. 7-15.)

51.     The United States Patent and Trademark Office issued an Office Action on January 5, 2006 rejecting all of the claims (Cross Decl., Ex. D), and particularly citing U.S. Patent Number 4,726,265 to Gillespie (Cross Decl., Ex. O).  The Gillespie reference was assigned to a predecessor to Johnson Screens, and later was assigned to Johnson Screens Filtration.  (Cross Decl., Ex. P.)

52.     In an amendment dated May 5, 2006 (Cross Decl., Ex. G), AFT added new claims 38 and 39 to the application (Cross Decl., Ex. G at 9).  In that same amendment, AFT introduced dictionary definitions from the Pulp and Paper Handbook.  (Cross Decl., Ex. G at 20-24.)

53.     As shown below, United States patent number 4,764,277 ("Yoshida") discloses a screening plate having two opposite faces.  One face has long, parallel grooves, each with a side face and bottom.  Openings extend through the bottoms of these grooves.  The second face has long grooves that extend to a depth so that the openings extend entirely through the thickness of the screening plate.  The grooves in the second face leave a plurality of spaced-apart ridges on the second face, and are inclined relative to the longitudinal extent of the groove.  (Cross Decl., Ex. Q.)



54.    The use of contours was common at least as early as the early 1980s.  (Cross

Decl., Ex. R at 145, lns. 1-3, 23 - 146, ln. 1.)  A person of ordinary skill in the art would have

known about contours and their utility at the time of the invention of the '940 Patent.  (Cross

Decl., Ex. R at 147, lns. 1-7.)

55.    The Yoshida reference illustrates a screen plate with a contour on the groove in

the inflow side of a screen plate, as shown in Figure 9 reproduced below.  (Cross Decl., Ex. R at

153, ln. 13; 155, lns. 9-11.)  The arrow indicates the inflow side of the screen plate (1), which

receives a slurry including pulp fibers.  The slot (2) has a "downstream side edge" that "is lower

than the upstream side edge in the direction of flow of pulp slurry . . . so that leading ends of the

pulp fibers flowing over in parallel with the screen plate may easily enter the slots (2)," and

which, therefore, includes an inclined surface.  (Cross Decl., Ex. Q at col. 2, lns. 3-7.)



56.    Welds, rivets, screws, adhesives, and solder, and their equivalents, which are used

for connecting two elements together are methods of attaching one piece of metal to another and

are commonly known for use in assembling pulp and paper screens.  (Cross Decl., Ex. S at 157,

ln. 11 - 158, ln. 2.)

57.    Both flat and cylindrical screens made of perforated metal plates and other screening media appear in patents dating at least to 1918, as shown, for example, in United States patent number 1,287,031.  (Cross Decl., Ex. T.)

58.    Backing and supporting structures used to add strength to screens have appeared in patents since at least the 1920s, as shown, for example, in United States patent number 1,615,559.  (Cross Decl., Ex. U.)


Dated: October 1, 2009                              Respectfully submitted,


                                                    /s/ David R. Cross
                                                    David R. Cross
                                                    Johanna M. Wilbert
                                                    QUARLES & BRADY LLP
                                                    411 East Wisconsin Avenue
                                                    Suite 2040
                                                    Milwaukee, WI  53202-4497
                                                    (414) 277-5000

                                                    Edward R. Conan
                                                    BOND, SCHOENECK & KING, PLLC
                                                    One Lincoln Center
                                                    Syracuse, NY 13202-1355

                                                    Attorneys for Defendant
                                                    J&L Fiber Services, Inc.