UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ADVANCED FIBER TECHNOLOGIES
(AFT) TRUST,

                              Plaintiff,

          -against-                                        1:07-cv-1191 (LEK/DEP)

J&L FIBER SERVICES, INC.,

                              Defendant.
_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

       This action, concerning the alleged infringement of U.S. Patent No. RE 39,940 (the "'940

patent"), returns before the Court.  Plaintiff Advanced Fiber Technologies ("Plaintiff" or "AFT"),

the owner of the '940 patent, asserts that the V-Max screen cylinder ("V-Max") made by Defendant

J & L Fiber Services, Inc. ("Defendant" or "J&L") infringes upon multiple claims of the '940

Patent.  Dkt. No. 1 ("Complaint").  Presently before the Court are Cross Motions for summary

judgment.  Dkt Nos. 208 ("Plaintiff Motion"); 214 ("Defendant Motion").  Also before the Court

are Defendant's Motion in limine to exclude the lost profits opinion of Mr. Andrew W. Carter

("Carter"), Defendant's Motion to strike AFT's new infringement contention, and Defendant's

Cross-Motion to amend its answer.  Dkt. Nos. 210 ("Motion to Exclude"); 213 ("Motion to Strike");

231 ("Motion to Amend").

## II.   BACKGROUND

       The facts stated herein are those relevant to the motions presently before the Court.  For a

more complete background on this case, reference is made to Advanced Fiber Techs. (AFT) Trust v.

<u>J & L Fiber Servs., Inc.</u>, 674 F.3d 1365, 1367-72 (Fed. Cir. 2012) ("<u>AFT II</u>") and <u>Advanced Fiber</u>

<u>Techs. (AFT) Trust v. J & L Fiber Servs.. Inc.</u>, 751 F. Supp. 2d 348, 353-54 (N.D.N.Y. 2010)

(Kahn, J.) ("<u>AFT I</u>").

The '940 Patent,[1] "relates to screen plates, e.g., screen cylinders and flat screen plates, for

use, for example, in the pulp and paper industry for screening pulps and to methods for their

manufacture." Dkt. No. 208-9 ("'940 Patent"). As described in the '940 Patent, screening is a

process "[i]n the formation of paper products from pulp," whereby "impurities, such as sticks,

shives and other undesirable pulp constituents, are removed" from the pulp. <u>Id.</u>, Col. 1, Lns. 16-18.

The '940 Patent "provides a screen formed of two separate layers. The first layer comprises a

screening plate having narrow slots or small apertures and the second layer comprises a backing

plate affording the screening plate the necessary structural strength for pressure screening in the

pulp and paper environment." <u>Id.</u>, Col. 2, Lns. 22-27.

Plaintiff commenced this action under 35 U.S.C. § 271 on November 9, 2007. Compl. On

February 22, 2008, Defendant answered, denying any infringement and asserting that the '940

Patent is invalid. Dkt. No. 12 ("Answer") ¶¶ 23-25. At issue were the three independent claims of

the '940 Patent—claims 1, 10, and 18—and various dependent claims. <u>See</u> <u>AFT II</u>, 674 F.3d at

1368. Claim 1 claims a screen cylinder comprising a screening medium and a structural backing

plate, both of which have openings.[2] '940 Pat., Col. 13, Lns. 24-30. Claim 10 claims "[a] screen

---

[1] The '940 Patent is a reissue of U.S. Patent 5,200,072 (the "'072 Patent"). <u>See</u> '940 Pat.; Compl., Ex. A (the "'072 Patent"). The '072 Patent was issued on April 6, 1993, based upon an application filed August 16, 1990. '072 Pat. The '940 Patent was issued on December 18, 2007, based upon an application filed September 12, 2003. '940 Pat.

[2] Claim 1 of the '940 Patent reads:

plate for screening pulp" comprising a screening medium with slots and a structural backing plate with openings. Id., Col. 14, Lns. 13-20. Claim 18 claims "a method of manufacturing a screen for use in screening for pulp." Id., Col. 15, Lns. 13-14.

In addressing the parties' motions for summary judgment in AFT I, the Court construed all then-disputed terms of the '940 Patent. AFT I, 751 F. Supp. 2d at 354. The Court construed the following claim terms:

> Screen Plate: "[A]n assembly comprising a 'screening medium,' also referred to as a 'screening plate' and a backing plate." Not synonymous with "screening plate," which is synonymous with "screening medium." Id. at 356-58.
>
> ————————————————
>
> A screen cylinder comprising:
>
> a generally cylindrical screening medium having a plurality of openings therethrough; a generally cylindrical structural backing plate for structurally supporting said screening medium and having a plurality of openings therethrough; [and]
>
> said screening medium and said structural backing plate lying concentrically one within the other and having respective opposed surfaces in engagement with one another at an interface therebetween whereby said backing plate structurally supports said screening medium;
>
> one of said screening medium and said backing plate having a plurality of circumferentially extending recesses formed in its opposing surface and opening at the opposing surface of the other of said screening medium and said backing plate at the interface thereof establishing communication between the respective openings of said screening medium and said backing plate; and
>
> a plurality of axially spaced projections spaced one from the other in the axial direction defining said recesses and projecting radially from one of said screening medium and said backing plate at said interface;
>
> the openings in said screening medium being elongated and extending in a generally axial direction substantially normal to the circumferential extent of said recesses.
>
> '940 Patent, Col. 13, Lns. 24-52.

Screening Medium: "A 'screening medium' is a perforated barrier through which stock is passed to remove oversized, troublesome, and unwanted particles from good fiber." Synonymous with "screening plate," which is distinct from "screen plate. Id. at 357-61.

Backing Plate: "[A] structural support for the screening medium that includes a metal plate." Id. at 361-63.

Slots and Openings: "[O]penings or slots with widths less than 0.254 mm." Id. at 363-65.

Engagement With: "[T]o interlock or mesh with." Id. at 365.

Means for Releasably Connecting: "A structure directly connected to the [screening medium and backing plate] that must be broken or removed to permit separation of the two parts, whereby welds, rivet screws, adhesives, solder and equivalents are the only 'means for releasably connecting.'" Id. at 365-71.

Shrink Fit: "A tight interference fit between mating inner and outer parts made by heating the outer member to expand it or cooling the inner part to contract it so that the outer part can fit into the inner part." Id. at 368-71. Not a "means for releasably connecting."

Rivet: "[A] short rod having a head formed on one end and an opposite end formed into a second head to produce a permanent joining of two or more parts." Id. at 370.

Adhesive: "[A] substance used to bond two or more solids so that they act or can be used as a single piece." Id. at 370-71.

The Court also construed "perforated," which appeared in its construction of "screening medium," to mean, "pierced or punctured with holes." Id. at 363.

Based on these constructions, the Court granted in part and denied in part Defendant's Motion for summary judgment and denied Plaintiff's Motion for summary judgment. Id. at 381. Both parties then moved for reconsideration of the Court's decision. Id. at 382. Upon reconsideration, the Court determined that, as construed, the term "screening medium" did not

encompass the "wedgewire" construction employed in the V-Max, because wedgewire is not "perforated." Id. at 386. The Court accordingly granted summary judgment of non-infringement to Defendant on all remaining claims. Id. at 386-87. Plaintiff appealed. AFT II, 674 F.3d at 1367.

On appeal, the Federal Circuit reversed the Court's grant of summary judgment on the ground that the Court erred in interpreting "perforated" as "pierced or punctured with holes." Id. at 1373-76. Rather, the Federal Circuit held that "'perforated' . . . simply means having holes or openings," in light of the '940 Patent's brief disclosure of a wedgewire construction. Id. at 1375. The Federal Circuit affirmed the Court's other appealed constructions and declined to address the Court's denial of summary judgment as to validity. Id. at 1376-77.

On remand, both parties renewed their Motions for summary judgement. Dkt. Nos. 150; 161. In a Memorandum-Decision and Order dated September 30, 2013, the Court considered the parties' renewed Motions only insofar as the Mandate of the Federal Circuit compelled a different result from that reached in AFT I. Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., No. 07-CV-1191, 2013 WL 5462684, at *5 (N.D.N.Y. Sept. 30, 2013) (Kahn, J.) ("AFT III"). Thus, the Court did not address the parties' arguments on validity because the Court's prior analysis did not turn on its erroneous construction of "perforated." Id. The Court also granted summary judgment for Defendant on Claim 18 and its dependent claims, and on any V-Max units that have wedgewire screening medium whose slots or openings are at least 0.254mm wide. Id. at *5-6. The Court denied summary judgment on all further grounds because the parties had not had opportunity to adequately direct their positions to the Court's claim construction. Id. at *6. Following the

framework offered by the Local Patent Rules,[3] the Court therefore held that its MDO would constitute its decision on claim construction, and reopened discovery for the parties to supplement expert reports and conduct discovery as otherwise necessitated by the Court's claim construction. Id. The Court ruled that the parties could not offer "new theories that would require construction of a term not already construed." Id.

Presently, Plaintiff seeks summary judgment of infringement and validity on claims 1, 4, 6, 8, 10-14, 16, 17, 27, 29, and 34 of the '940 Patent. Dkt. No. 208-1 ("Plaintiff Memorandum"). Defendant moves for summary judgment of non-infringement as to claims 1, 2, 4, 6, 8, 10-17, 24, 27, 29, 31, 32, 34, 36, and 37-39, and summary judgment of invalidity under 35 U.S.C. § 112(a) on claims 1 and 10, and all depending claims. Dkt. No. 214-1 ("Defendant Memorandum"). Defendant also moves to strike as untimely Plaintiff's infringement contention that the V-Max's U-Clip ("U-clip" or "PosiLock") joint satisfies the "in engagement with" limitation of claims 1 and 10; Defendant argues that if the Court grants the Motion to strike, then summary judgment of non-infringement as to claims 1, 2, 4, 6, 8, 10-17, 27, 29, 31-32, 34, and 37-39 would be appropriate. Dkt. No. 213-1 ("Motion to Strike Memorandum"); Def. Mem. at 10. Finally, Defendant moves to exclude the Carter Opinion. Mot. Exclude. Defendant additionally argues that it is entitled to summary judgment on Plaintiff's claim for lost profits for the reasons set forth in the Motion to exclude, whether or not the Court grants the Motion. Def. Mem. at 29-31.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) instructs a court to grant summary judgment if "there

---

[3] The Local Patent Rules only became effective on January 1, 2012, after this action was commenced.

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows that there is no genuine dispute as to any material fact, the burden shifts to the nonmoving party to demonstrate "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. This requires the nonmoving party to do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586 (1986).

At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). A court's duty in ruling on a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

IV.     INFRINGEMENT

Once a court has construed the meaning of a patent's claims, the second part of a patent infringement action is to compare "the properly construed claims to the accused device" to

determine infringement. <u>Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC</u>, 350 F.3d 1327, 1338 (Fed. Cir. 2003) (citing <u>Cybor Corp. v. FAS Techs., Inc.</u>, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc)). A device infringes a patent where "every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." <u>PC Connector Solutions LLC v. SmartDisk Corp.</u>, 406 F.3d 1359, 1364 (Fed. Cir. 2005). Infringement is a question of fact, <u>Ferguson</u>, 350 F.3d at 1338, and summary judgment is only appropriate where there is no genuine issue of material fact regarding the accused device, <u>Laitram Corp. v. Morehouse Indus., Inc.</u>, 143 F.3d 1456, 1461 (Fed. Cir. 1998).

The parties' Motions raise four issues regarding infringement of the '940 Patent by the V-Max. First, Defendant alleges that Plaintiff has untimely changed its theory of how the V-Max infringes the "in engagement with" limitation, and accordingly moves to strike that contention. Mot. Strike. Second, the parties dispute whether the V-Max contains an "adhesive," as construed by the Court, and therefore whether the V-Max infringes claims 4 and 34. Pl. Mem. at 9-10; Def. Me. at 7-8. Third, Defendant argues that non-infringement is appropriate under the Reverse Doctrine of Equivalents. Def. Mem. at 11-19. Finally, Defendant requests that the Court clarify its prior grant of summary judgment of non-infringement on any "V-Max units whose wedgewire screening media employ slots or openings at least 0.254 mm wide." Def. Mem. at 31-33.

### A. Motion to Strike

Defendant moves to strike Plaintiff's infringement contention that the V-Max's U-Clip joint satisfies the "engagement" limitation of claims 1 and 10 as untimely.[4] Mot. Strike; Def. Mem. at

---

[4] Plaintiff argues that Defendant's Motion to Strike is moot in light of Defendant's stipulation of literal infringement of claims 1 and 10 and all depending claims. Dkt. Nos. 228 ("Motion to Strike Response) at 6. Plaintiff further argues that Defendant stipulated to waive its

10. Defendant argues that Plaintiff's purported change in position violates the Court's rder in AFT III, limiting supplementation of expert reports and discovery responses to those "necessitated" by the Court's claim construction. Mot. Strike at 4. Defendant further argues that this change of position violates Plaintiff's obligations under Rule 26 and Rule 37 of the Federal Rules of Civil Procedure to timely and diligently update expert reports and discovery responses.[5] Id. at 5.

The Court first considers Defendant's allegations concerning Plaintiff's shift in position. Defendant alleges that Plaintiff's preliminary infringement contention on the "engagement" limitation did not rely on the U-Clip. Id. at 2. Defendant cites Plaintiff's claim charts in the April 2009 report of its expert Gary M. Scott ("Scott") and May 2009 report of its expert Robert Gooding ("Gooding"). See Dkt. Nos. 213-5, Ex. C at 2; 213-6. The claim charts demonstrate the "engagement" limitation at a location "where the screening medium and backing plate are in contact with each other, but not a location where there is a U-Clip joint." Mot. Strike at 2. Defendant alleges that Plaintiff first changed its claim charts in a November 2013 Scott expert report, which

---

right to any "procedural defenses," by not explicitly reserving such defense. Dkt. No. 251 ("Plaintiff Sur-Reply") at 1. The Court does not agree with such a cramped reading of Defendant's stipulation; while the stipulation notes that Defendant "still has defenses of reverse doctrine of equivalence . . . as well as any invalidity defenses as well," the Court does not understand that to be an inclusive list of Defendant's defenses. Defendant did not stipulate to dropping any defense.

[5] Rule 26(e) requires parties to supplement its discovery disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process." FED. R. CIV. P. 26(e). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). The Court may impose alternative sanctions in lieu of precluding information or testimony at trial. See FED. R. CIV. P. 37(c)(1)(C).

includes a photograph of the V-Max's U-Clips to demonstrate the "engagement with" limitation.[6] Dkt. No. 213-10, Ex. C at 2. In later depositions, both Gooding and Scott have identified the U-Clip as satisfying the "engagement with" limitation. Dkt. Nos. 213-3 at 163:16-20; 213-11 at 158:12-15.

Plaintiff, on the other hand, contends that its position that the V-Max contains the "engagement with" limitation has been consistent throughout the litigation. Mot. Strike Resp. at 9-10; Pl. Sur-Reply at 2. Plaintiff argues that it has identified the claim limitation "respective opposed surfaces in engagement with one another at an interface therebetween" in the V-Max since its initial claim charts in 2009. Pl. Sur-Reply at 2. Plaintiff claims that Defendant originally admitted that the V-Max had opposed surfaces in engagement with one another, see Dkt. Nos. 39-11 ¶¶ 31, 34; 86-2 ¶¶ 15-16, and that it was therefore unnecessary for Plaintiff "to further address the issue," Mot. Strike Resp. at 9. Plaintiff contends, however, that after the Court's claim construction, Defendant changed course and argued that Plaintiff had not specifically identified the "engagement" limitation in the V-Max. Pl. Sur-Reply at 2 (citing Dkt. No. 161-1 at 7-10). Plaintiff in response identified the U-Clip as "an opposed surface" satisfying the "engagement" limitation. Id. (citing Dkt. No. 168 at 22-24). Plaintiff claims that any statement by its experts that the U-Clip meets the "engagement" limitation, "reflects the fact that the V-Max includes the claimed engaged opposed surfaces, and that one of the surfaces may be located on the U-Clip," and does not mean that "the U-Clip or any other connector is required to meet the 'engagement with' limitation." Id. at 3. Plaintiff's claim is therefore not that the U-Clip satisfies the limitation, but that the "the respective opposed

---

[6] The Court notes that Defendant first made this argument in the briefing on the renewed summary judgment motions following remand, and that there, Defendant contended that Plaintiff first disclosed this new infringement contention in a November, *2012* response brief. See Dkt. No. 176 at 14-26. In Plaintiff's November 30, 2012 Reply, Plaintiff relies on the U-Clip as satisfying the "engagement" limitation. See Dkt. No. 168 at 24.

surfaces" that are in "engagement" at the U-Clip satisfies the limitation.

The Court agrees that Plaintiff has not impermissibly changed its claim. The Court reiterates that a "sea of troubles . . . can arise when dispositive motions are filed on the merits prior to final claim construction." AFT III, 2013 WL 5462584, at *6. This case, which was commenced before the Local Patent Rules became effective, has followed a complicated schedule. Thus, where the Local Patent Rules chart "a clear course for patent actions that provides for discovery, briefing, and a final decision on claim construction before deadlines even begin to run for merits discovery and expert reports," id., in this case, the parties have filed several rounds of dispositive motions that have delayed the setting of deadlines.

The parties filed renewed summary judgment motions post-appeal, without having first had an opportunity to supplement their expert reports and conduct additional discovery in light of the Court's claim construction. The parties therefore were "reduced to basing their arguments on . . . whether the other party is raising new arguments or could have anticipated the Court's construction." Id. Defendant argued that Plaintiff had not shown that the "engagement" limitation, construed by the Court to mean "to interlock." Dkt. No. 161-1 at 7-10. When Plaintiff specifically identified "the respective opposed surfaces" that are in "engagement" at the U-Clip, Defendant argued that Plaintiff was impermissibly changing its claim. Dkt. No. 176 at 14-26. Thus, following the model of the Local Patent Rules, the Court reopened discovery to allow the parties to supplement their expert reports and conduct discovery. AFT III, 2013 WL 5462584, at *6. The Court's order aimed to allow the parties to "re-anchor their positions" to the Court's claim construction. Id.

The Court does not find that Plaintiff changed its infringement contention during the post-

appeal summary judgment briefing. Plaintiff merely clarified the "respective opposed surfaces" that are in "engagement," in response to a new argument made by Defendant in reliance on the Court's claim construction. Regardless, even if the Court did find that Plaintiff had changed its position, the Court would not find it impermissible, specifically because the Court reopened discovery to enable the parties to supplement expert reports and conduct additional discovery. <u>See</u> Dkt. No. 185. Plaintiff disclosed its alleged new infringement contention in its supplemental Scott expert report on November 6, 2013, following the schedule for serving supplemental expert reports set by the Court. Dkt. No. 213-10, Ex. C at 2. Defendant subsequently submitted supplemental interrogatory responses, supplemental expert reports, and deposed Plaintiff's expert and fact witnesses. Mot. Strike Resp. at 8 (citing Dkt. Nos. 208-10; 208-17; 208-18). The Court accordingly finds that Plaintiff's alleged amendment of its contention would have been timely and consistent with its 26(a) obligations. Furthermore, Defendant is not prejudiced because it had the opportunity to conduct discovery on Plaintiff's amended contention consistent with <u>AFT III</u>.

Defendant's Motion to strike is therefore denied.

**B. Claims 4 and 34**

The parties cross move for summary judgment on whether the V-Max contains the "adhesive" limitation claimed in claims 4 and 34. Pl. Mem. at 9-10; Def. Mem. at 7-8. Claims 4 and 34 claim:

> 4. A screen cylinder according to claim 2, wherein said means for releasably connecting includes and adhesive.

> 34. A screen plate according to claim 32, wherein said means for connecting comprises an adhesive.

'940 Patent.

The parties dispute whether the V-Max includes an "adhesive," as construed by the Court. Specifically, Plaintiff argues that it is undisputed that the V-Max contains "an epoxy between the screening medium and backing plate," and that the epoxy is an "adhesive" as construed by the Court. Dkt. Nos. 208-2 ("Plaintiff Statement of Material Facts") ¶¶ 14; 230-1 ("Defendant Response to Statement of Material Facts") ¶ 14-15. Defendant, on the other hand, states that Plaintiff has no evidence that the epoxy used in the V-Max forms a bond strong enough to hold the backing plate and screening medium together "so that they act or can be used as a single piece," as required by the Court's construction of "adhesive." Dkt. No. 214-2 ("Defendant Statement of Material Facts") ¶ 30. The epoxy, Defendant claims, is "applied to the U-clips to fill the channels of the U-clips around the elongated pins;" what Plaintiff indicates in photographs is merely "residual epoxy." Def. Resp. SMF ¶¶ 14, 16.

Having reviewed the evidence presented by the parties, the Court finds that there are disputed issues of material fact regarding whether the epoxy is an "adhesive." Specifically, Plaintiff has identified an epoxy on both the outer surface of the screening medium and inside surface of the backing plate. Pl. SMF ¶¶ 16-17. Defendant, however, has responded with evidence that AFT has not presented evidence that the epoxy forms a bond that holds the backing plate and screening medium together "as a single piece." Def. Resp. SMF ¶ 15. The Court has reviewed the deposition testimony that Defendant cites for this proposition. In Scott's February 18, 2014 Deposition, Scott acknowledged that he could not state that the "epoxy" would be sufficient to hold together the screening medium and backing plate; Gooding similarly acknowledged the lack of a test for the

bonding strength of the epoxy.  Dkt. Nos. 214-7 at 144:17-145:3; 214-8 at 136:14-137:5.[7]  However,

both Scott and Gooding also stated that the appearance of the epoxy on both the screening medium

and backing plate was indicative of bonding.  Dkt. Nos. 214-7 at 144:4-144:8; 136:7-136:11.

Mindful of the parties' respective burdens of proof on summary judgment, the Court finds

that Defendant has created an issue of material fact with respect to the bonding strength of the

epoxy, but that Defendant has not presented sufficient evidence to warrant summary judgment in its

favor.  The Court finds that a reasonable trier of fact, reviewing the deposition testimony cited by

Defendant and the evidence produced by Plaintiff, could find that the epoxy satisfies the Court's

construction of "adhesive."  Accordingly, the Court denies both parties' Motions for summary

judgment on claims 4 and 34.

### C. Reverse Doctrine of Equivalents

Defendant has asserted a defense of non-infringement under the Reverse Doctrine of

Equivalents (the "RDOE").  Def. Mem. at 11-19.  The RDOE applies "where a device is so far

changed in principle from a patented article that it performs the same or similar function in a

substantially different way, but nevertheless falls within the literal words of the claim."  Graver

Tank & Mfg. v. Linde Air Prods Co., 339 U.S. 605, 608-09 (1950).  The RDOE may then be

invoked "to restrict the claim and defeat the patentee's action for infringement."  Id. at 609.  The

RDOE is an equitable doctrine intended "to prevent unwarranted extension of the claims beyond a

fair scope of the patentee's invention."  Scripps Clinic & Research Found. v. Genentech, Inc., 927

F.2d 1565, 1581 (Fed. Cir. 1991).

---

[7] Defendant also cites the Declaration of Mark Lutz ("Lutz"), a J & L employee.  Dkt. No.
86-2.  Lutz states that the "residual epoxy" would not have "sufficient bond strength to connect or
secure the screen panels to the frame so that these components can act as a single piece."  Id. ¶ 21.

*1. Affirmative Defense*

It is undisputed that Defendant did not raise the RDOE as an affirmative defense in its Answer. Pl. SMF ¶ 22; Def. Resp. SMF ¶ 22. Plaintiff argues that Defendant therefore waived any defense under the RDOE by failing to assert it in its answer. Pl. Mem. at 9-10. Defendant disputes that the RDOE is an affirmative defense. Dkt. No. 230 ("Defendant Opposition") at 5-6. Alternatively, Defendant has moved for leave to amend its Answer to include the RDOE as an affirmative defense. Mot. Am.; 231-1 ("Motion to Amend Memorandum").

An affirmative defense is any defense "that does not controvert the opposing party's *prima facie* case." Cornwall v. U.S. Cons. Mfg., Inc., 800 F.2d 250, 252 (Fed. Cir. 1986); see also Black's Law Dictionary 430 (7th ed. 1999) (defining "affirmative defense as "[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true."). Failure to raise an affirmative defense in an answer to a complaint results in waiver of that defense. Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 967 F.2d 742, 751-52 (2d Cir. 1992).

While the minimal case-law is split, the Court agrees with Plaintiff that the RDOE is an affirmative defense. SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107 (Fed. Cir. 1985), states that "[w]hen a patentee establishes literal infringement, the accused infringer may undertake the burden of going forward to establish the fact of non-infringement under the [RDOE]." 775 F.2d at 1123-24. The Court understands this statement to mean that: (1) the accused infringer bears the burden on an RDOE defense; and (2) because an RDOE defense is made once the patentee has made its *prima facie* case of literal infringement, the defense therefore does not controvert the patentee's *prima facie* case of literal infringement. The Court accordingly concludes that the RDOE is an affirmative

defense.  See also Translogic Tech., Inc. v. Hitachi, Ltd., No. CV 99-407, 2005 WL 425465, at *1

(D. Or. Feb. 22, 2005) (referring to RDOE as an affirmative defense); Jewish Hosp. of St. Louis v.

IDEXX Labs., 973 F. Supp. 24, 27-28 (D. Me. 1997) (same).[8]

Because Defendant did not raise the RDOE in its answer, see Answer, the Court must

consider Defendant's Motion to amend.  Federal Rule of Civil Procedure 15(a) provides that leave

to amend should be "freely give[n]."  FED. R. CIV. P. 15(a).  Plaintiff argues that the stricter "good

cause" standard in Federal Rule of Civil Procedure 16(b)(4) applies, Dkt. No. 243 ("Plaintiff

Reply") at 26, because the deadline for amended pleadings was May 1, 2008, see Dkt. No. 18.  The

Court agrees that good cause provides the correct standard under which to review Defendant's

Motion to amend.  See Parker v. Columbia Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2000).

Nonetheless, the Court  finds that Defendant has shown good cause.

"[A] finding of 'good cause' depends on the diligence of the moving party."  Parker, 204

F.3d at 340.  The parties agree that Defendant first raised its RDOE defense in its Supplemental

Rule 26(a)(2)(B) Rebuttal Expert Report of Peter Seifert on Non-infringement served on December

16, 2013.  Pl. SMF ¶ 25; Def. Resp. SMF ¶ 25.  The disclosure of that report was consistent with the

discovery schedule set by the Court after AFT III.  Dkt. No. 185.  As discussed above, the Court

reopened discovery in order to allow the parties to supplement their expert reports and conduct

discovery necessitated by the Court's claim construction.  AFT III, 2013 WL 5462584, at *6.

Defendant, after its construction of "engagement" was rejected by the Court in AFT I, therefore

_____

[8] The Court also considered Integra Lifesciences I, Ltd. v. Merck KgaA, No. 96-CV-1307,
2000 WL 35717874 (S.D. Cal. Feb. 3, 2000), which was cited by Defendant.  The Court does not
agree with the conclusion in Integra that the RDOE merely controverts the patentee's *prima facie*
case of literal infringement, 2000 WL 35717874, at *3, because the RDOE applies to restrict the
meaning of the patentee's claim, regardless of the claim's literal meaning.

disclosed a defense that it believe necessitated by the Court's accepted construction. The Court

does not find that it showed a lack of diligence in disclosing its RDOE defense at that time; AFT III

provides the proper reference for viewing Defendant's diligence, since that decision constituted the

Court's decision on claim construction. Id. Defendant therefore acted diligently in disclosing its

RDOE defense in accordance with the discovery deadlines set up by the Court following AFT III.

The Court acknowledges Plaintiff's arguments that it is prejudiced, Dkt. No. 243-1, but does

not find them compelling. Plaintiff had two months to conduct discovery on Defendant's RDOE,

and deposed Defendant's expert on the RDOE. Dkt. No. 232-4. The schedule for expert reports

and discovery deadlines was the same as that contemplated in the Local Patent Rules. Moreover,

Plaintiff did not request an extension for discovery, even though it was aware of Defendant's RDOE

defense. If two months were insufficient for it to conduct discovery on the RDOE defense, then

Plaintiff should have requested an extension. See Dkt. No. 187 (stating that extensions may be

granted upon a showing of "good cause").

The Court therefore grants Defendant's Motion to amend its Answer.

   *2. Analysis*

Defendant has stipulated to literal infringement of claims 1 and 10, and all depending

claims, but argues that summary judgment of non-infringement is appropriate under the RDOE

"because the V-Max performs the function of engaging the screening medium to the backing plate

in a substantially different, innovative and considerably better way than the '940 Patent." Def. Mot.

at 11-12.

To prevail on a RDOE defense, a defendant must first establish the "principle" or "equitable

scope of the claims" of the patented invention, "determined in light of the specification, the

prosecution history, and the prior art." <u>Scripps</u>, 927 F.2d at 1581.  A defendant must then show that

the accused device "preforms the same or similar function in a substantially different way." <u>Graver</u>

<u>Tank</u>, 339 U.S. at 608-09.  Non-infringement under the RDOE raises a question of fact. <u>SRI</u>, 775

F.2d at 1124 ("Words like 'so far' 'principle' and 'substantially' are not subject to rigid pre-

definition.").  "If the accused infringer makes a *prima facie* case" under the RDOE, then "the

patentee, who retains the burden of persuasion on infringement, must rebut that *prima facie* case."

<u>Id.</u>

Defendant proposes that the principle of the "engagement" limitation is "to provide an easily

replaceable screening medium to enable re-use of the backing cylinder."  Def. Mot. at 12.  In

support of its contention, Defendant cites to several places in the specification that describe how the

screening medium can be replaced.  '940 Pat., Col. 2, Lns. 18-19; Col. 4, Lns. 19-25; Col. 10, Lns.

10-15.  Moreover, Defendant observes that fourteen of the thirty-six dependent claims recite

"releasably connecting" the screening medium and backing plate. <u>Id.</u>, Col. 13, Ln. 24 to Col. 16,

Ln. 47.  Because the specification and claims indicate that the screening medium is "replaceable"

and "releasable," Defendant therefore argues that the function of the "engagement" limitation must

be to enable "replacement" of the screening medium; Defendant states that "it would be illogical to

permanently 'interlock or mesh' the screening medium and backing plate and then add a "releasable

connector.'"  Def. Mot. at 13.

Defendant next argues that the "way" the "engagement" limitation functions in the '940

Patent is by "a shrink fit." <u>Id.</u>  Defendant claims that a shrink fit is the appropriate scope of the

"engagement" limitation because it is: (1) the only disclosed method of "engagement"  in the

specification and (2) the prior art and prosecution history show that other types of

connectors—welds, rivets, solders, screws, and adhesives—were all known in the art. Id. at 14-15. Moreover, Defendant argues that a shrink fit "does not enable 'easy replacement,' but rather provides a tight, immobile interference fit between the screening medium and the backing plate." Id. at 13. Thus, Defendant argues that the "engagement" limitation should not be given the broad scope as construed, but should be equitably narrowed. Id. at 13-15.

Plaintiff argues that Defendant has failed to establish the correct principle of the '940 Patent and therefore, has failed to make a *prima facie* defense under the RDOE. Dkt. No. 232 ("Plaintiff Opposition") at 13-17. Specifically, Plaintiff argues that the claims, specification, and prosecution history neither support Defendant's proposed principle of "an easily replaceable screening medium," nor limiting the scope of the "engagement" limitation to a shrink fit. Id. The Court agrees.

Nothing Defendant cites in the specification and claims supports its argument that the '940 Patent provides an *easily* replaceable screening medium; rather, the specification merely discloses that the screening medium is "replaceable." '940 Pat., Col. 4, Lns. 19-20 ("[T]he screening plate can be replaced when worn by breaking the welds or other securing means between the backing and screening plates."); Id., Col. 2, Lns. 17-19 ("[T]he present invention enables substantially reduced replacement costs of the screen plates when worn."). Indeed, replacement of the screening medium may require "machining," "cutting," or "breaking" the screening plate apart. Id., Col. 4, Lns. 19-25; Col. 10, Lns. 15-18; Col. 11, Lns. 52-56. These processes do not suggest that the screening medium is easily replaced, only that it can be replaced. The reference to "substantially reduced costs" does not indicate ease of replacement; it merely indicates that the cost of replacing the screening medium is substantially less than replacing the entire screen cylinder. Id., Col. 7, Lns. 16-18. Defendant also offers descriptions by Plaintiff's experts of an "easily replaceable" screening medium, see Dkt.

No. 242 ("Defendant Reply") at 3, but such statements are irrelevant to determining a patent's principle under the RDOE, <u>Roche Palo Alto LLC v. Apotex, Inc.</u>, 531 F.3d 1372, 1378 (Fed Cir. 2009). Therefore, neither the specification, nor the claims, support finding that the principle of the "engagement" limitation is "an easily replaceable screening medium."

The Court also disagrees to the extent Defendant argues that the scope of the "engagement" limitation should be limited to a shrink fit, based on the specification, prior art, and prosecution history. The Court notes at the outset that "[t]he Federal Circuit has counseled against limiting claims to the preferred embodiments or specific examples in the specification." <u>Ciena Corp. v. Corvis Corp.</u>, 334 F. Supp. 2d 598, 605 (D. Del. 2004).

The Court disagrees with Defendant's characterization of the specification as only describing "engagement" by shrink fit. Def. Mot. at 13-14. It is true that the Court in <u>AFT I</u> recognized that the "means for releasably connecting" are "welds, rivets, screws, adhesives, solders, and equivalents." <u>AFT I</u>, 751 F. Supp. at 371. Moreover, the Court recognized that a shrink fit is not a "means for releasably connecting," <u>id.</u> at 370, and is a method of "engagement," <u>id.</u> at 365. However, the Court did not therefore "equate" the "means for releasably connecting" with welds, rivets, screws, and adhesives, and "engagement" with a shrink fit. Def. Reply at 8. The Court did not find that the only support for its construction of "engagement" was the disclosed shrink fit. Rather, the Court cited to an embodiment of a "flat screen plate," where "the two flat plates are registered one with the other . . . and secured one to the other, for example, by *welding, soldering, riveting* or *adhesives*. The backing plate thus *engages* the screening plate." <u>AFT I</u>, 751 F. Supp. 2d at 365 (citing '940 Pat., Col. 3, Lns. 5-11).

Defendant argues that the flat screen plate embodiment "should be disregarded," because it

20

is inconsistent with "the claims and the Court's claim construction." Def. Reply at 8. Defendant contends "there are no claims that either cover or are supported by the embodiment," since Plaintiff claimed welds, rivets, screws, and adhesives as "means for releasably connecting." Id. On the contrary, claim 10 claims a "screen plate," with "respective opposed surfaces in engagement with one another," as described in the embodiment. Pat. '940, Col. 14, Lns. 21-26. The embodiment clearly describes a screening plate and backing plate that are "secured to one another," by "welding, soldering, riveting or adhesives," and thus are "engaged" to one another. Id., Col. 3, Lns. 5-11. Thus, while welds, rivets, solders, adhesives may be "means for releasably connecting" in other embodiments where the components are engaged by a shrink fit, in the flat screen plate embodiment, those techniques are a method of "engagement." The specification therefore shows that a shrink fit is not the only technique for "engaging" the screening medium and backing plate.

The Court is not persuaded by Defendant's attempt to show, through the prosecution history and prior art, that a "shrink fit was the only claim to any type of connection that would have been allowed by the PTO, had the connector been considered part of the independent claim." Def. Reply at 7. The Court does not find this evidence compelling in light of the specification and claims.

Having failed to establish the correct principle of the '940 Patent, Defendant has failed to make out a *prima facie* case under the RDOE. Roche, 531 F.3d at 1378. Summary judgment is therefore granted in favor of Plaintiff on Defendant's RDOE defense.

### D. "Slots and Openings" at Least 0.254mm

Defendant moves to clarify the Court's grant of summary judgment in its favor in AFT III "as to any V-Max units whose wedgewire screening media employ slots or openings at least 0.254 mm wide." Def. Mem. at 31-33. The parties sharply dispute the meaning of the Court's order. Plaintiff

contends that the Court's claim construction of claims 1 and 10 requires a "plurality of slots [or openings] less than .254 mm wide"; therefore, a V-Max will infringe if it has a plurality—two or more slots—less than 0.254 mm, even if it includes some slots greater than 0.254 mm. Pl. Opp'n at 34. Defendant, on the other hand, contends that the Court's order granted summary judgment as to any V-Max that employs more than one slot or opening at least 0.254mm wide. Def. Mem. at 32.

The Court in AFT I did not construe the phrase in claim 1, "a plurality of openings therethrough," or in claim 10, "a plurality of slots therethrough." The Court did, however, construe "openings and slots," AFT I, 751 F. Supp. at 363-65, and the parties do not dispute that "plurality" means "more than one" or "at least two," Pl. Opp'n at 34. Although the Court has stated that it will not consider theories that would require construction of a term not already construed, AFT III, 2013 WL 5462584, at *6, the Court will clarify its construction of "openings and slots," and thus, its grant of summary judgment in AFT III.

The Court in AFT I construed "openings" and "slots" to mean "openings or slots with widths less than 0.254 mm." AFT I, 751 F. Supp. at 365. The Court's construction was based on the prosecution history, when Plaintiff "disavowed any slot width that was not suitable for screening pulp." Id. Plaintiff, the Court found, "unequivocally disavowed *any* slot with a width equal to or greater than 0.254 mm." Id. (emphasis added). The Court's claim construction then was clear: a "screening medium having a plurality of openings therethrough" means a screening medium with more than one opening, where *all* such openings are less than 0.254 mm wide. Plaintiff attempts to re-argue the Court's claim construction, stating that there is nothing in the specification or prosecution history that would require a "plurality of openings" to mean all openings. Pl. Opp'n at 34. The Court will not consider further argument on the issue.

The Court therefore finds that its prior grant of summary judgment in <u>AFT III</u> applies to any V-Max employing more than one slot or opening at least 0.254 mm wide.

## V.  VALIDITY

Plaintiff moves for summary judgment of validity on claims 1, 4, 6, 8, 10-14, 16, 17, 27, 29, and 34 with respect to Defendant's four remaining invalidity arguments.  Pl. Mem. at 12. Specifically, Plaintiff moves for summary judgment on the following invalidity arguments: "(1) obviousness based upon the Johnson Screens Brochure alone; (2) anticipation and/or obviousness based upon Gillespie alone; (3) obviousness based upon the combination of the PIMA Article, Burgess and other references; and (4) invalidity under 35 U.S.C. § 112." <u>Id.</u>

Defendant has cross-moved for summary judgment of invalidity on claims 1 and 10 and all depending claims, under 35 U.S.C. § 112(a).  <u>See</u> Def. Mem. at 21-29.

The Court notes that in <u>AFT III</u> it reserved judgment on the renewed Motions on validity because the Court of Appeals' decision in <u>AFT II</u> did not affect the Court's analysis in <u>AFT I</u>.  <u>AFT III</u>, 2013 WL 5462584, at *5.  Therefore, the Court will not consider any arguments on validity or invalidity offered by the parties that the Court previously decided in <u>AFT I</u>.

### A.  Legal Standard

Patents enjoy a presumption of validity.  35 U.S.C. § 282.  That presumption can be overcome only through facts supported by clear and convincing evidence.  <u>See</u> <u>SRAM Corp. v. AD-II Eng'g</u>, 465 F.3d 1351, 1357 (Fed. Cir. 2006) (citing <u>U.S. Surgical Corp. v. Ethicon, Inc.</u>, 103 F.3d 1554, 1563 (Fed. Cir. 1997)).  Thus, where a party seeks summary judgment invalidating a patent, it can prevail only by submitting such clear and convincing evidence of the patent's invalidity that no reasonable jury could find otherwise.  <u>Id.</u> (citing <u>Perkin-Elmer Corp. v. Computervision Corp.</u>, 732

23

F.2d 888, 893 (Fed. Cir. 1984)).  A party may challenge a patent's validity by introducing clear and convincing evidence that the patent was anticipated by prior art.  35 U.S.C. § 102(a); <u>Linear Tech. Corp. v. Int'l Trade Comm'n</u>, 566 F.3d 1049, 1066 (2009).  Alternatively, a party may challenge a patent's validity based on its obviousness to a person of ordinary skill in the art at the time of the patent application.  35 U.S.C. § 103; <u>KSR Int'l Co. v. Teleflex, Inc.</u>, 550 U.S. 398 (2007).  A party may also prove a claim's invalidity by showing its failure to comply with 35 U.S.C. § 112, ¶ 4.  <u>Pfizer, Inc. v. Ranbaxy Labs., Ltd.</u>, 457 F.3d 1284, 1292 (Fed. Cir. 2006) (citing <u>Curtiss-Wright Flow Control Corp. v. Velan, Inc.</u>, 438 F.3d 1374, 1380 (Fed. Cir. 2006)).

### 1. Anticipation

A party is not entitled to a patent where "the invention was known or used by others in this country, or patented or described in a printed publication . . . before the invention thereof by the applicant for patent, or the invention was patented or described in a printed publication . . . or in public use or on sale . . . more than one year prior to the date of the application for patent."  35 U.S.C. § 102.  A party challenging the validity of a patent may prevail by demonstrating the existence of prior art that "was sufficiently accessible, at least to the public interested in the art, so that such a one by examining the reference could make the claimed invention without further research or experimentation."  <u>In re Hall</u>, 781 F.2d 897, 899 (Fed. Cir. 1986); <u>see also</u> <u>In re Wyer</u>, 655 F.2d 221, 226 (C.C.P.A. 1981).  "A prior art reference anticipates a patent claim if the reference discloses, either expressly or inherently, all of the limitations of the claim."  <u>Finnigan Corp. v. Int'l Trade Comm'n</u>, 180 F.3d 1354, 1365 (Fed. Cir. 1999).  Where the validity of a device claim is challenged on anticipation grounds, the challenger need only show that the prior art is structurally equivalent to the challenged patent; in the face of such a challenge, the patent owner cannot prove

the validity of its patent by reference to its different use or function. In re Schreiber, 128 F.3d 1473, 1477-78 (Fed. Cir. 1997); Hewlett-Packard Co. v. Bausch & Lomb, Inc., 909 F.2d 1464, 1468 (Fed. Cir. 1990).

     *2. Obviousness*

Section 103 prohibits the issuance of patents where "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. Patents issued in violation of this rule are invalid. While "the ultimate question of patent validity is one of law," validity ultimately rests on factual inquiries as to (1) the scope and content of prior art; (2) differences between that prior art and the claimed invention; (3) the level of ordinary skill in the pertinent art; and (4) any other indicia of obviousness or non-obviousness. Graham v. John Deere Co. of Kansas City, 383 U.S. 1 (1966); KSR, 550 U.S. 398 (2007). "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." KSR, 550 U.S. at 416.

**B.  Johnson Screens Brochure**

Plaintiff moves for summary judgment that claims 1 and 10, and all depending claims, are not obvious based on the Johnson Screens Brochure ("Johnson") alone. Pl. Mem. at 15. Plaintiff claims that Defendant's obviousness argument based on Johnson alone is new, and therefore is not subject to the Court's decision not to revisit its invalidity decisions in AFT I. Id.

Plaintiff asserts that the Court already held in AFT I, as a matter of law, that Johnson "does not disclose a 'screening medium' that is 'in engagement with' a 'backing plate'"; therefore, Defendant's new claim fails as a matter of law. Id. Defendant, however, correctly states that the

25

Court did not grant summary judgment of validity in favor of Plaintiff. Dkt. No. 230 ("Defendant Opposition") at 22. Rather, the Court held that Johnson fails to "conclusively" disclose a "screening medium" that is "in engagement with" a "backing plate." <u>AFT I</u>, 751 F. Supp. 2d at 377. Thus, the Court found that there was a genuine issue of material fact and denied Defendant's Motion of summary judgment of invalidity on Johnson. Plaintiff has not made other arguments that Defendant's new obviousness argument is otherwise inadequate as a matter of law. The Court therefore denies Plaintiff's Motion for summary judgment of validity on Defendant's new obviousness argument.

### C. Gillespie

Plaintiff moves for summary judgment on Defendant's argument that claims 1, 6, 8, 10-12, 17, 27, and 29 are either anticipated or rendered obvious by Gillespie. Pl. Mem. at 7. Defendant's argument is new and was not addressed by the Court in <u>AFT I</u>.

Plaintiff claims that summary judgment of validity over Gillespie is appropriate because Gillespie fails to disclose a "screening medium," "openings and slots with widths less than 0.254 mm," or "opposed surfaces in engagement with one another at an interface therebetween." Pl. Mem. at 16. Plaintiff states that this is clear from the prosecution history: the PTO initially rejected claims 1 and 10 based on Gillespie, but Plaintiff successfully argued that Gillespie does not disclose a "screening medium" because it does not disclose the process of screening pulp and its slots are too large for screening pulp.

In a novel argument, and without citation, Defendant argues that prosecution disclaimer does not protect the patentee for the purposes of an invalidity challenge; thus, Plaintiff cannot invoke the finding by the PTO that Gillespie did not disclose "openings and slots with widths less than 0.254

mm" against an invalidity challenge.  Def. Opp'n at 12.  Defendant argues that there is evidence, which indicates that the slot widths in Gillespie could be used for screening pulp, that the PTO did not have.  Id. at 14.  Defendant therefore argues that the Court's construction of "slots and openings" should not limit the invalidating effect of Gillespie, and that, in light of Defendant's evidence, "the Court should consider the claim terms the way the PTO evaluates claim scope."  Id. The Court does not agree.  As Defendant acknowledges, "[i]t is axiomatic that claims are construed the same way for both invalidity and infringement."  Amgen, Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1330 (Fed. Cir. 2003).  The Court has construed the claim term "slots and openings" in light of the prosecution history disclaiming the slot sizes in Gillespie; the question, therefore, is whether Gillespie discloses "openings and slots with widths of less than 0.254 mm."  Because it is undisputed that Gillespie does not disclose openings and slots of that width, and Defendant has not created an issue of fact regarding the obviousness of modifying the slot widths in Gillespie, summary judgment of validity on Gillespie is appropriate.

### D.  PIMA Article

Plaintiff moves for summary judgment on whether the PIMA Article ("PIMA") discloses a "backing plate," in light of new evidence.  Pl. Mem. at 17-18.  Plaintiff acknowledges that the Court already denied summary judgment of validity in AFT I because Plaintiff relied on pre-claim construction testimony; however, Plaintiff argues that it is appropriate for the Court to reconsider the issue in light of post-claim construction testimony.  Id. at 12-13.  The Court agrees and will consider the new evidence.

Plaintiff claims that new evidence shows that PIMA does not include a metal plate as a matter of law.  Pl. Mem. at 18.  In a deposition on February 6, 2014, Mark Lutz ("Lutz"), one of the

primary designers of the V-Max, Dkt. No. 208-14 ("Lutz Deposition") at 9:11-14, stated, with

respect to the rings in PIMA, that he "would consider them to be a frame," id. at 24:13-14, "after

[they] are cut from whatever they are cut from and they're assembled into this frame," id. at 24:7-9.

Defendant asserts that this mischaracterizes Lutz's testimony; earlier Lutz affirmatively answered

the question, "[d]o you consider that frame to be a structural support for a screening medium that

includes a metal plate?" Id. at 23:9-12. Lutz identified the "metal plate" as "[t]he rings," which he

assumed, "would be made from a plate, would be cut out of a plate." Id. at 23:13-19.

Plaintiff also relies on the testimony of Timothy Cromell, a product engineer for Defendant,

who stated that he would not consider PIMA to be a structural support for screening medium which

includes a metal plate. Dkt. No. 208-16 at 42:19-23. Defendant's expert, Peter Seifert, has testified

that PIMA includes a metal plate. Dkt. No. 230-8 at 189:4-190:16.

Construing the evidence in the light most favorable to Defendant, the Court finds that there

are disputed issues of material fact as to whether PIMA discloses a "backing plate" that preclude

granting summary judgment. Defendant has presented expert testimony that PIMA does "include a

metal plate," and the testimony of Lutz, construed favorably to Defendant, indicates the same. A

jury may not agree with Seifert's and Lutz's assumption that PIMA discloses rings made out of a

plate, but that is not a determination for the Court to make. Therefore, Plaintiff's Motion of

summary judgment of validity on PIMA is denied.

### E. Enablement - § 112(a)

Defendant claims that the '940 Patent fails to enable the full scope of the "engagement"

limitation and of the "screening medium" limitation under 35 U.S.C. § 112(a). Def. Mem. 20-28.

Section 112(a) provides that "the specification must teach those skilled in the art how to

make and use the full scope of the claimed invention without undue experimentation." Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1365 (Fed. Cir. 1997) (internal quotation marks omitted). "That some experimentation may be required is not fatal; the issue is whether the amount of experimentation required is 'undue.'" In re Vaeck, 947 F.2d 488, 495 (Fed. Cir. 1991) (citing In re Wands, 858 F.2d 731, 736-37 (Fed. Cir. 1988)). The specification need not "necessarily describe how to make and use every possible variant of the claimed invention, for the artisan's knowledge of the prior art and routine experimentation can often fill gaps." AK Steel Corp. v. Sollax & Ugine, 344 F.3d 1234, 1244 (Fed. Cir. 2003).

Enablement is a question of law, based on underlying factual issues. Automotive Techs. Int'l, Inc. v. BMW of N. Am., Inc., 501 F.3d 1274, 1281 (Fed. Cir. 2007). "The evidentiary burden to show facts supporting a conclusion of invalidity is one of clear and convincing evidence because a patent is presumed valid." Strick v. Dreamworks, LLC, 516 F.3d 993, 999 (Fed. Cir. 2008).

### 1. Engagement

Defendant claims Plaintiff cannot satisfy the standard for enablement because: (1) the '940 Patent does not enable the full scope of the "engagement" limitation, which "encompass[es] virtually all connections between a screening medium and a backing plate," Def. Mot. at 22, and (2) the Patent does not enable one of ordinary skill to produce an adequate shrink fit without undue experimentation, id.

### a. Scope of Enablement

The parties sharply dispute whether the '940 Patent enables the fulls scope of the engagement limitation as construed by the Court. See, e.g., Pl. Mem. at 19-20; Pl. Opp'n at 25-27; Def. Reply at 9-10. Plaintiff claims that it is well established that "[t]he enablement requirement is

met if the description enables any mode of making and using the invention."  Pl. Opp'n at 27-28

(citing John Hopkins Univ. v. CellPro, Inc., 152 F.3d 1342, 1361 (Fed. Cir. 1998); LizardTech, Inc.

v. Earth Res. Mapping, Inc., 424 F.3d 1336, 1344 (Fed. Cir. 2005); Amgen Inc. v. Hoechst Marion

Roussel, Inc., 314 F.3d 1313, 1335 (Fed. Cir. 2003); Durel Corp. v. Osram Slyvania Inc., 256 F.3d

1298, 1307 (Fed. Cir. 2001); Engel Indus., Inc. v. Lockformer Co., 946 F.2d 1528, 1533 (Fed. Cir.

1991)).  Defendant, on the other hand, claims that "enabling a single embodiment does *not* enable

the full scope of broad claims."  Def. Reply at 9-10 (citing, *inter alia*, MagSil Corp. v. Hitachi

Global Storage Techs., Inc., 687 F.3d 1377, 1382 (Fed. Cir. 2012); Sitrick v. Dreamworks, LLC,

516 F.3d 993, 1000 (Fed. Cir. 2008); Auto. Techs., 501 F.3d at 1282; Liebel-Flarsheim Co. v.

Medrad, Inc., 481 F.3d 1371, 1380 (Fed. Cir. 2007)).

Having carefully reviewed the cited cases, the Court finds it is sufficient that the

specification enable *any* mode of "engaging" the screening medium and the backing plate.  While

Defendant is correct that there are many modes of connecting a screening medium and a backing

plate that would satisfy the claim language as construed, it does not therefore follow that the full

scope of the claim extends over all of those possible types of connection.  The Court finds that the

full scope of the claim is, "respective opposed surfaces in engagement with one another at an

interface therebetween;" the scope of the claim is *not* the hundreds of methods of connecting two

components.

Considering the case-law helps to clarify the distinction between alternative modes of

making an invention and claims that have a broad scope.  In Durel Corp., the court rejected the

defendant's argument that the patent was not enabled because the inventors had not prepared

coatings from each of the precursors suggested in the specification; it was sufficient, the court

stated, so long as the claimed oxide coating was enabled from at least one of the suggested precursors. 256 F.3d at 1307. Similarly, in <u>John Hopkins</u>, the court rejected the defendant's argument that certain disclosed alternatives modes were not enabled, because the preferred mode was enabled. 152 F.3d at 1361. In the cases relied upon by Defendant, by contrast, it is the scope of the claims that is at issue. In <u>Auto Techs</u>, the claim was construed to cover both mechanical and electronic sensors; the court, however, found that the full scope of the claim was then not enabled because the specification only enabled mechanical sensors. 501 F.3d at 1282. In <u>MagSil</u>, the claims were construed to cover resistance changes "up to infinity;" the court, however, found that the specification did not enable that entire scope. 687 F.3d at 1381.

The Court finds the present case analogous to <u>Durel Corp.</u> and <u>John Hopkins</u>, and not to <u>Auto Techs</u> and <u>MagSil</u>. The full scope of the claim is simply a screening medium "engaged" to a backing plate; it is not, as Defendant suggests, all theoretical methods of connecting two components, Def. Reply at 12. Therefore, so long as a single method "engaging" a screening medium to a backing plate is enabled, the '940 Patent satisfies § 112(a).

<u>b. Whether the '940 Patent Enables "Engagement"</u>

The Court must next consider whether the '940 Patent enables "engagement." A disclosure is enabled where it would not require "undue experimentation;" <u>Wands</u> articulated factors relevant to whether experimentation is "undue": "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." <u>Wands</u>, 858 F.2d at 737.

Defendant argues that, applying the Wands factors, the specification of the '940 Patent does not provide adequate guidance to produce a shrink fit without undue experimentation. Def. Mem. at 22-23. Defendant specifically relies on testimony of Gooding, Plaintiff's expert, who testified to the challenges of shrink-fitting, among which he included: "obtaining uniformity;" the "great diversity of sizes and models and operating environments;" "predicatability in terms of controlling the temperature;" and "high level of stresses." See Dkt. No. 214-8 ("Gooding Deposition") at 35:17 to 37:7. However, the specification, Defendant contends, merely describes a shrink fit without addressing any of these challenges. Def. Mem. at 24. Plaintiff states in response that Seifert, Defendant's expert, has admitted that a shrink fit would require only routine experimentation. Pl. Opp'n at 26. In context, Seifert stated that the disclosure was an "invitation to experiment" and that "you may get away with it and may not get away with it." Dkt. No. 232-4 at 61:4-8. On other occasions, Seifert testified that a shrink fit would work "in some instances but not in other instances." Dkt. No. 232-4 at 54:13-15. Based on the foregoing testimony, the Court finds that there are issues of material fact regarding whether a shrink fit could be achieved from the specification without undue experimentation.

However, the Court has also found that the specification's disclosure of "engagement" is not limited to a shrink fit and Plaintiff claims that regardless of whether the specification enables a shrink, it is undisputed that it also contains a "working example" of engagement by weld. Pl. Opp'n at 25. Plaintiff, however, has not presented evidence under the Wands factors to establish enablement by weld.

Accordingly, to the extent the parties move for summary judgment on the enablement of the "engagement" limitation, those motions are denied.

## 2.  Screening Medium

Defendant also moves for summary judgment on whether the specification enables a "screening medium."  Def. Mem. at 24-29.  Similar to its enablement argument on "engagement," Defendant asserts that the '940 Patent does not enable the full scope of the "screening medium" limitation because it does not enable a wedgewire screen.  Id. at 25.  However, Defendant's argument again fails because it is sufficient that the specification "enable any mode of making and using the invention."  John Hopkins, 152 F.3d at 1361.  Plaintiff has produced evidence that the specification does enable a non-wedgewire screening medium, see Dkt. No. 232-4 at 33:6-18, and therefore, Defendant's Motion for summary judgment on the enablement of a screening medium is denied.

### F.  Enablement - § 112(b)

Plaintiff moves for summary judgment on Defendant's claim that claims 1 and 10 are invalid under 35 U.S.C. § 112(b) because Plaintiff did not claim what it now asserts is the invention.  Pl. Mem. at 20.  Defendant's claim is that "the invention recited in claims 1 and 10 requires an additional 'connector' in order to function as a screen cylinder (e.g., a weld, rivet, etc.), and since claims 1 and 10 do not include an additional connector, AFT failed to claim what it regards as the invention."  Pl. SMF ¶ 60; Def. Resp. SMF ¶ 60.  However, Defendant's claim fails because the Court has determined that "engagement" is not, as Defendant assumes, limited to a shrink fit.  The specification describes "engaged" opposed surfaces by "welding, soldering, riveting or adhesives," without any additional connector.  '940 Pat., Col. 3, Lns. 5-11.  Accordingly, summary judgment is granted in favor of Plaintiff to the extent Defendant makes a claim under § 112(b).

## VI.    LOST PROFITS

## A. Motion to Exclude Carter Opinion

Plaintiff offered Carter's initial Expert Report on May 1, 2009 and his Supplemental Expert Report on July 29, 2009. Dkt. Nos. 210-3, Ex. A; 210-4, Ex. B. Carter was asked to identify the damages that would be appropriate in the event Defendant was found to infringe any of the asserted claims of the '940 Patent. Dkt. 210-3, Ex. A at 2. On March 1, 2013, Plaintiff served Carter's Second Supplemental Expert Report, which took account of the Court's ruling that the only openings or slots less than 0.254 mm infringe the '940 Patent. Dkt. No. 210-5, Ex. C at 3. On January 29, 2014, Plaintiff served the Third Supplemental Carter Expert Report, which reflected Plaintiff's belief, based on new analysis of Defendant's "slot size tolerances," that V-Max cylinders with a stated slot size of up to 0.28 and/or 0.30 mm "are likely to fall within the Court's slot size restriction." Dkt. 201-6, Ex. D at 4.

To recover lost profits, a patentee bears the burden of establishing "a reasonable probability that, but for the infringement, it would have made the infringer's sales." Oiness v. Walgreen Co., 88 F.3d 1025, 1029 (Fed. Cir. 1996). "The 'but for' inquiry . . . requires a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee would . . . have made." Grain Processing Corp. v. Am. Maize-Prods. Co., 185 F.3d 1341, 1350 (Fed. Cir. 1999). Market reconstruction requires "project[ing] economic results that did not occur," and therefore, "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." Id.

Carter's analysis of Plaintiff's entitlement to lost profits followed the four factor test set out by the Sixth Circuit in Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156 (6th Cir. 1978). Dkt. No. 201-3, Ex. A at 21. The Panduit factors require that a patent owner

demonstrate: "(1) demand for the patented product, (2) absence of acceptable infringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." 575 F.2d at 1156. The Panduit test is a recognized method for a patentee to prove lost profits. See Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1545 (Fed. Cir. 1995).

Defendant moves to exclude Carter's Report insofar as it offers an opinion on lost profits under Federal Rule of Evidence 702 for the following reasons: (1) Carter is unqualified to offer expert opinion on lost profits; (2) Carter's methodology for identifying acceptable non-infringing alternatives is inherently flawed; (3) Carter's methodology for determining his "base case" is not based on plausible market reconstruction; and (4) Carter's analysis is grounded in incorrect data. Mot. Exclude. For the following reasons, Defendant's Motion is denied.

### 1. Legal Standard

Where "scientific, technical, or other specialized knowledge will assist the trier of fact . . . a witness qualified as an expert by knowledge, skill, experience, training, or education" may offer an opinion, if the proposed testimony "is based upon sufficient facts or data, . . . is the product of reliable principles and methods, and [ ] the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. The Court has a "gatekeeping responsibility" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579, 597 (1993). In assuming this role, the Court applies a "presumption of admissibility." See Borawick v. Shay, 68 F.3d 597, 610 (2d Cir. 1995); Lappe v. American Honda Motor Co., Inc., 857 F. Supp. 222, 226 (N.D.N.Y. 1994).

The Court's inquiry under Daubert focuses not on the substance of the expert's conclusions,

but on the principles and methodology used to generate the conclusions.  Daubert, 509 U.S. at 595.

To assist with this inquiry, the Court may consider the following factors laid out in Daubert: (1)

whether the expert's technique or theory can be or has been tested; (2) whether it has been subjected

to peer review and publication; (3) whether it has a high known or potential rate of error; and (4)

whether it is generally accepted in the relevant scientific community.  Kumho, 526 U.S. at 149-50

(citing Daubert, 509 U.S. at 592-94).  This list "neither necessarily nor exclusively applies to all

experts or in every case."  Id. at 141.  Indeed, the trial court has "the same kind of latitude in

deciding how to test an expert's reliability . . . as it enjoys when it decides whether or not that

expert's relevant testimony is reliable."  Id. at 152.

Under this framework, courts first examine whether the proposed witness qualifies as an

expert; that is, whether the proposed witness has specialized knowledge, skill, experience, training,

or education that would assist the trier of fact in understanding the evidence or deciding on

particular issues in the case.  Aspex Eyewear, Inc. v. Altair Eyewear, Inc., 485 F. Supp. 2d 310, 318

(S.D.N.Y. 2007) (citing Baker v. Urban Outfitters, Inc., 254 F. Supp. 2d 346, 352 (S.D.N.Y. 2003));

see also Nora Beverages, 164 F.3d at 746.

Second, the Court must examine the relevance and reliability of the proposed expert

testimony.  With respect to reliability, "[t]he district court should consider the indicia of reliability

identified in Rule 702: (1) that the testimony is grounded on sufficient facts or data; (2) that the

testimony is the product of reliable principles and methods; and (3) that the witness has applied the

principles and methods reliably to the facts of the case."  Aspex, 483 F. Supp. 2d at 319 (citations

and internal quotations omitted).

    2.  *Qualifications*

Carter is a founding member of Ocean Tomo, LLC, an intellectual capital firm, which provides intellectual property expert services, valuation, asset and risk management, and corporate finance. Dkt. No. 210-3, Ex. A at 1. As indicated by his resume, Carter's work at Ocean Tomo is focused on intellectual property asset purchase and licensing, damages expert witness testimony in infringement lawsuits, and intellectual property risk management. Id., Ex. 1 ("Carter CV"). Previously, Carter was a founding partner at Duff & Phelps Capital Partners Sale/License-Back Fund, where Carter was co-head of the patent purchase and licensing team. Id. at 1. Carter has fifteen years of experience participating in the determination of damages in commercial litigation, in most cases, for intellectual property infringement claims. Id. Carter has testified regarding lost profits in at least four cases at trial, and in other cases that settled or were arbitrated. Dkt. Nos. 225-2, Ex. A at 17-28; 225-3, Ex. B at 6-7. Carter is a Certified Public Accountant ("CPA"), and holds an MBA, and an undergraduate degree in chemical engineering. Dkt. No. 210-3, Ex. A at 1. He has taught a masters level course on intellectual property management, which includes a class on damages. Dkt. No. 225-5.

Defendant asserts that, whatever Carter's experience in intellectual property valuation, there is no evidence that he is qualified in market reconstruction. Defendant argues that Carter does not have education or training in economics, and has not published any economic papers in peer-reviewed journals. Mot. Exclude at 7-9. Carter's only experience with market reconstruction, Defendant suggests, is from testifying as an expert, which is insufficient experience to qualify him to offer expert testimony. Id. at 10 (citing IBEW 90 Pension Fund v. Deutsche Bank AG , No. 11 Civ. 4209, 2013 WL 5815472 (S.D.N.Y. Oct. 28, 2013)). Furthermore, Defendant argues that, even if Carter's experience testifying as an expert is considered, that experience is "extremely limited."

<u>Id.</u>

The Court agrees with Plaintiff that Defendant's arguments are inconsistent with the Second Circuit's liberal application of expert qualification requirements.  <u>TC Sys. Inc. v. Town of Colonie, N.Y.</u>, 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2002); <u>Henry v. Champlin Enters., Inc.</u>, 288 F. Supp. 2d 202, 220 (N.D.N.Y. 2003) ("Liberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications.").  "[C]ourts have not barred an expert from testifying merely because he or she lacks a degree or training narrowly matching the point of dispute in the lawsuit."  <u>Canino v. HRP, Inc.</u>, 105 F. Supp. 2d 21, 27 (N.D.N.Y. 2000).  In the Court's opinion, Carter's education and experience are sufficient to qualify him to testify as an expert on lost profits, and specifically, with respect to consumer demand and market principles.  The Court agrees with Plaintiff that Carter's opinion applies "methodologies, analyses and principles" that he would use in other related non-litigation services.  Dkt. No. 225 at 10.  It is undisputed that Carter has significant experience in the valuation and licensing of intellectual property.   Mot. Exclude at 7.  While not an economist, Carter has studied economics as part of his MBA and as an undergraduate, Dkt. No. 225, Ex. B at 129, and has also taught a graduate level course that included a class on lost profits.  Finally, Carter has testified regarding lost profits in at least four other trials and a number of other cases.  The Court therefore finds that Carter has sufficient experience to qualify as an expert under <u>Daubert</u> and Rule 702.  Defendant's challenges to the strength of Carter's credentials, "go to the weight, not the admissibility, of his testimony."  <u>McCullock v. H.B. Fuller Co.</u>, 61 F.3d 1038, 1044 (2d Cir. 1995).

### 3. Reliability of Carter's Opinion

As stated *supra*, Carter's analysis followed the <u>Panduit</u> factors.  On the first two factors,

Carter found that: (1) demand for V-Max can be attributed to the features of the '940 Patent and (2) there were no acceptable non-infringing alternatives. Dkt. No. 210-3 at 23. Carter next determined Plaintiff's manufacturing and marketing capacity. Id. at 26. Finally, Carter calculated the profit Plaintiff would have made but for Defendant's infringement. Id. at 28-30. The Court considers Defendant's specific objections to Carter's analysis.

a. Methodology for Determining Acceptable Non-infringing Alternatives

The Second Panduit factor requires the patentee to show the "absence of acceptable noninfringing substitutes." 576 F.2d at 1156; see generally Grain-Processing, 185 F.3d at 1350-51 ("[A] fair and accurate reconstruction of the 'but for' market also must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed. Without the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether."). Defendant attacks Carter's determination that there were no acceptable non-infringing alternatives available to Defendant as being contrary to evidence that there were viable alternatives. Mot. Exclude at 11-17. Defendant asserts that Carter's report does not set forth a methodology for determining whether customers find an alternative to be an acceptable substitute. Id. at 13.

Carter considered a number of screen cylinder offerings as potentially non-infringing substitutes. Dkt. No. 210-3, Ex. A at 23. The products he considered included: Defendant's non-accused screen cylinders; alternative screen concepts Defendant considered prior to its decision to manufacture the V-Max; and screen cylinders offered by Plaintiff's and Defendant's mutual competitors. Id. at 24. Carter's analysis was based on Defendant's and Plaintiff's sales, and

available information on their customers.  Id. at 23.  Carter looked at "thousands of customer call records."  Dkt. No. 225-2, Ex. A at 71-72.  Carter's analysis found—based on the sales data and call reports—that the potential substitutes did not provide the same benefits as the V-Max or Durashell,[9] and therefore were not acceptable alternatives.  Dkt. No. 210-3, Ex. A at 26.

The Court finds that Carter's opinion on the absence of acceptable substitutes is grounded on "sufficient fact and data" and is the "product of reliable principles and methods."  Carter considered potential substitutes, but concluded that they were not acceptable based on extensive sales data and call reports.  For example, the V-Max was priced at a premium among Defendant's range of screen cylinders, yet its sales consistently grew relative to those other cylinders; Carter therefore concluded that Defendant's other cylinders were not acceptable alternatives because they did not have the benefits of the V-Max.

Defendant essentially argues that Carter did not weigh certain evidence adequately, including an internal AFT memorandum and certain call reports.  The Court finds that these challenges again go to the weight of Carter's opinion, not its admissibility.  McCullock, 61 F.3d at 1044.

### b.  "Base Case" Methodology

The Fourth Panduit factor requires a patentee to quantify the profit it would have realized but for the infringement.  Panduit, 575 F.2d at 1156.  In a situation where the patentee and infringer are the only suppliers in the market, the patentee might then seek to "recover profits lost through every sale made by the infringer."  St. Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1578

---

[9] The Durashell is the screen cylinder manufactured and markted by AFT.  Dkt. no. 210-3, Ex. A at 17.

(Fed. Cir. 1989).  Carter, while noting it would not be "unreasonable to assume" that Plaintiff lost all of Defendant's V-Max sales as a result of the alleged infringement, alternatively calculated a "conservative 'base case' based upon an analysis of the sales records produced by the parties."  Dkt. No. 210-3, Ex. A at 28-29.  Carter's initial methodology for calculating the "base case," identified "those customers to which J & L sold an accused V-Max after that customer had initially purchased an AFT Durashell."  Id. at 29.  In his first supplemental report, Carter revised his "base case" calculation to add "[a]ny J & L V-Max sale recorded after which AFT was confirmed to have been actively promoting its Durashell to the same mill."  Dkt. No. 210-4, Ex. B at 4.

Defendant argues that Carter has provided no explanation why these assumptions would reliably identify customers to which a Durashell would have been sold if the V-Max had been unavailable.  Mot. Exclude at 18.  Defendant claims that this approach is wholly unprecedented.  Id. at 19.  Defendant further argues that by offering the "base case," Plaintiff recognizes that other products compete with the V-Max and the Durashell; in a market with multiple competitors, the "market share" approach is appropriate.  Id.  Defendant also states that Carter's opinion lacks indicia of reliability.  Id. at 20-22.

The Court first addresses Defendant's contention that Carter's base case methodology is novel.  Plaintiff has cited case-law in response.  See Haemonetics Corp. v. Baxter Healthcare Corp., 593 F. Supp.2d 303, 306 (D. Mass. 2009); Yarway Corp. v. Eur-Control USA, Inc., 775 F.2d 268, 276 (Fed. Cir. 1985).  In Haemonetics, for example, the patentee's expert opined that the patentee would have only captured 90% of the infringer's sales "to be conservative" and "taking into account his 'experience' that there are always some customers of the patent infringer would have been unwilling to buy from the patentee for reasons completely unrelated to the product itself."

41

Haemonetics, 593 F. Supp. 2d at 306. The court found that "[s]uch methodology is not pure speculation." Id. Carter's "base case" methodology is similar, and therefore is not inadmissible merely because it is novel.

The Court also finds that Defendant's indicia of unreliability do not warrant excluding Carter's opinion. For example, Defendant cites Carter's failure to consider the amount of time between when a customer learned about the Durashell and when the customer first purchased a V-Max; citing one instance, Defendant argues that it is not "sound economics" to infer that a customer who purchased a V-Max four-and-a-half years after learning about the Durashell, did so because of its rebuildability and would have instead bought a Durashell "but for" the infringement. Mot. Exclude at 20. Defendant states that this is one of many such call reports. Dkt. No. 210-6, Ex. D at Ex. 13. However, Defendant's argument, while challenging Carter's conclusion, does not establish that Carter's analysis is unreliable. Defendant's other arguments similarly go to the weight of Carter's opinion, and not its admissibility.

### c. Manufacturing Capacity Data

Finally, Defendant contends that Carter's determination that Plaintiff had "sufficient manufacturing capacity to meet the incremental demand represented by any quantity of J&L's accused sales," Dkt. No. 210-3, Ex. A at 27, is based on insufficient data, because he used data from AFT, Inc., not AFT, Mot. Exclude at 23. Defendant contends that AFT does not have any employees and that it is AFT, Inc. that provides "general services" to operate the business for a monthly fee paid by AFT. Mot. Exclude at 23. Furthermore, Defendant claims that during the relevant period AFT, not AFT, Inc., was the owner of the '940 Patent. Id. Accordingly, Defendant claims that Carter's analysis of AFT's profit margin should have looked at the amount AFT paid

AFT, Inc., in monthly fees, and not AFT, Inc.'s direct fees.  Id. at 23-24.

Carter relied on conversations with Mr. Michael Stevens, Dr. Robert Gooding, and M. Jacques Beauchemin, top level employees at AFT, for his determination that AFT had sufficient manufacturing capacity.  Dkt. No. 210-3, Ex. A at 2, 27.  The Exhibits Defendant cites to as showing that Carter considered AFT, Inc.'s direct costs nowhere indicate that the data is for AFT, Inc.  See, e.g., Dkt. No. 210-6, Ex. D at Ex.7.1 ("Summary of *AFT's* Incremental Profit Margin"); Ex. 7.3 ("Summary of *AFT's* Historical Direct Costs").  To the extent Defendant contends that Carter relies on incorrect facts, that is again an issue of weight, not admissibility.

### B. Defendant Summary Judgment Motion on Lost Profits

Defendant moves for summary judgment on Plaintiff's entitlement to lost profits, even if the Court denies its Motion to exclude the Carter Opinion, because it contends that the Carter opinion is insufficient evidence to meet Plaintiff's burden on lost profits.  Def. Mem. at 30.  For the same reasons the Court denied Defendant's Motion to exclude, Defendant's Motion for summary judgment on Plaintiff's entitlement to lost profits is also denied.

Alternatively, Defendant requests that the Court grant summary judgment on Plaintiff's entitlement to lost profits as to any sales of V-Max units in Asia or Europe.  Def. Mem. at 30.  Defendant contends that Plaintiff's customers in Europe and Korea are invoiced by local subsidiaries, from which the cash flows to AFT, Inc., and then to AFT.  Id.  Defendant claims that Plaintiff has not produced evidence that all of the profits for sales by its European and Korean subsidiaries flow to it and cannot therefore recover lost profits for those sales.  Id. (citing Poly-Am., L.P. v. GSE Lining Tech., Inc., 383 F.3d 1303, 1310-11 (Fed. Cir. 2004) (holding that patent owner cannot recover the lost profits of its non-exclusive licensee sister corporation )); see also Mars, Inc.

v. Coin Acceptors, Inc., 527 F.3d 1359, 1367 (Fed. Cir. 2008) (finding that record did record did not show subsidiary's profits flowed "inexorably" to parent and therefore affirming grant of summary judgment that parent could not recover).

Plaintiff responds that all Durashell screen cylinders are assembled in AFT's Canada manufacturing facility, Pl. Opp'n at 31; when a Durashell is sold in Europe or Asia, there is an intercompany sale between AFT and the local subsidiary, Dkt. No. 232-4, Ex. B ("Beauchemin Declaration") ¶ 4. For such an intercompany sale, the local subsidiaries would transfer funds to AFT, which would make a profit from the sale; the profit made by AFT would be "essentially the same as if the product was sold to a customer in North America." Beauchemin Decl. ¶ 6.

Defendant argues that Plaintiff's evidence is insufficient to establish that the profits flow "inexorably" to AFT. Def. Reply at 15-16. "Inexorable" means that the profits flow automatically from the subsidiary to the parent; in other words, the subsidiary's profits *are* the parent's profits. See Kowalski v. Mommy Gina Tuna Res., 574 F. Supp. 2d 1160, 1163 (D. Haw. 2008) (holding that profits did not inexorably flow to sole owner of corporation where the flow was "no more inexorable than [his] intent that it be so"). Mindful of its duty to construe facts in the light most favorable to the non-moving party, the Court finds that Plaintiff has produced enough evidence that a rational trier of facts could conclude that the profits of its European and Asian subsidiaries flow inexorably to AFT. Specifically, Plaintiff has shown that the structure of the relationship between AFT and its European and Asian subsidiaries is such that the profits for all Durashells sold in Europe or Asia flow to AFT by intercompany sale. While the qualification that the profit is "essentially" the same as when AFT invoices the sales itself, suggests that the profits of foreign sales do not flow automatically to AFT, the Court must construe this in the light most favorable to

44

Plaintiff. Accordingly, Defendant's Motion for summary judgment on Plaintiff's entitlement to lost profits in Europe and Asia is denied.

## VII.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Plaintiff AFT's Motion (Dkt. No. 208) for summary judgment of infringement and validity is **GRANTED in part and DENIED in part** consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that Plaintiff AFT's Motion (Dkt. No. 208) is **GRANTED** to the extent it seeks summary judgment on: (1) Defendant's Reverse Doctrine of Equivalents defense; (2) validity on Defendant's anticipation/obviousness arguments based on Gillespie; and (3) Defendant's § 112(b) argument; and **DENIED** in all other respects; and it is further

**ORDERED**, that Defendant J&L's Motion (Dkt. No. 214) for summary judgment is **DENIED**; and it is further

**ORDERED**, that Defendant J&L's Motion (Dkt. No. 210) to exclude the lost profits opinion of Andrew W. Carter is **DENIED**; and it is further

**ORDERED**, that Defendant J&L's Motion (Dkt. No. 213) to strike AFT's new infringement contention is **DENIED**; and it is further

**ORDERED**, that Defendant J&L's Cross-Motion (Dkt. No. 231) for leave to file an amended answer is **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:     March 31, 2015
           Albany, NY


                                    Lawrence E. Kahn
                                    U.S. District Judge